UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AULTCARE CORPORATION, et al., | ) | CASE NO. 5:12CV972 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| WILLIS MAST, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is defendants' motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6). (Doc. No. 6.) Plaintiffs filed a memorandum in opposition (Doc. No. 7) and defendants filed a reply (Doc. No. 8). For the reasons set forth below, the motion is **DENIED**.

**I. BACKGROUND**[1]

On April 20, 2012, plaintiffs AultCare Corporation ("AC"), as third-party administrator of the Mast Trucking Inc. Group Medical Plan ("the Plan"), and AultCare Insurance Company ("AIC"), fka McKinley Life Insurance Company ("McKinley") (collectively, "plaintiffs"), filed this action against defendants Willis Mast ("Mast"), Timothy Hanna ("Hanna"), and Hanna's current and former law firms ("the Firm"),[2] "to enforce the terms of an employee medical benefits plan, aka ERISA plan . . . , that was sponsored by Mast Trucking, Inc., for equitable relief arising under the Employee Retirement Income Security Act

---

[1] This factual background is based on the allegations of the complaint, which are taken as true for purposes of a Rule 12 motion to dismiss.

[2] Hanna is currently a member of the law firm of Leiby, Hanna, Rasnick, Towne, Evanchan, Plamisano & Hobson, LLC. (Compl. ¶ 4.) He was formerly a member of two other law firms during times relevant to this action: Parker, Leiby, Hanna & Rasnick, LLC and Leiby, Hanna & Rasnick, LLC. For ease of reference, the Court will refer to all these law firms collectively as "the Firm."

of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, pursuant to the civil enforcement provisions of 29 U.S.C. § 1132(a)(3), and for damages for violations of the Plan's subrogation and reimbursement provisions, for the breach of fiduciary duties owed to the Plan, and for appropriation and conversion of Plan assets." (Doc. No. 1, Compl. ¶ 1.)[3]

Mast was a participant in the Plan on December 4, 2006, when he was injured in a golf cart accident in Las Vegas, Nevada. His friend, Stephen Mullet ("Mullet") was the driver of the golf cart that struck Mast and broke his right ankle. (Compl. ¶¶ 8-10.) Mast was admitted through the emergency department of a hospital in Las Vegas, where he underwent orthopedic surgery to repair his ankle. (Compl. ¶¶ 11-12.) The Plan paid Mast's medical expenses incurred in Nevada, as well as additional expenses incurred after he returned home. In total, the Plan paid $54,367.54 for Mast's medical expenses. (Compl. ¶ 17.)

On December 1, 2008, Hanna filed a lawsuit in Stark County Court of Common Pleas on behalf of Mast against Mullet[4] and McKinley, dba AultCare ("Mast I"). (Compl. ¶ 18 and Ex. A, Case No. 2008CV5102.) Count One stated a claim of negligence against Mullet and Count Two sought a declaratory judgment that McKinley and AC had no right of subrogation and/or right of reimbursement in any insurance benefits received and/or damages recovered by Mast from Mullet.[5] (Compl. ¶¶ 18-23.) AC filed a cross-claim against Mullet, but dismissed it after Mast and Mullet settled. (Compl. ¶ 24.) In a judgment entry dated September 17, 2009, the state court, upon the parties' stipulation, dismissed Count One with prejudice. It further ruled,

---

[3] Attached to the complaint is a partial document purportedly containing the Plan terms relating to subrogation, reimbursement, and other insurance. (Compl. ¶ 36 and Ex. F.) As noted herein, defendants challenge the applicability of this document, asserting that they had never seen it prior to the filing of the complaint and that, in the state court tort action, a different document was presented.

[4] Mullet was insured by Ohio Farmers Insurance Company (a Westfield Group company).

[5] McKinley hired lawyers from the law firm of Kreiner & Peters to defend the Plan and allegedly incurred legal fees exceeding $13,000. In the instant action, the Plan seeks to recover those fees and costs. *See* Compl. ¶ 47.

upon Mast's stipulation, that McKinley "does have contractual rights of subrogation and reimbursement in this case." However, the court made "no determination of whether or not McKinley Life Insurance Co. has any right to any remedy under the foregoing contractual rights because those issues are not currently before the Court." (Compl. ¶ 24 and Ex. G.)

On March 17, 2010, Mast executed a release and settlement agreement (Compl. ¶ 26 and Ex. B),[6] acknowledging acceptance of payment "in full and final settlement" of all claims against Mullet and his insurer, Westfield Insurance Company. This document recited that the consideration was to be paid in two checks: one issued by Westfield Insurance for the exact sum of medical expenses paid by the Plan ($54,367.54)[7] and naming AultCare Corporation "as subrogee of Willis Mast" as one of the payees,[8] and the other for $122,649.04 issued by Westfield Insurance to the Releasors. Mullet's counsel sent the two checks to the office of Mast's counsel in April 2010. (Compl. ¶ 28.) The former check has apparently never been cashed and has remained in the possession of the Firm and/or Hanna; after it became stale, Ohio Farmers Insurance issued a second check in the same amount on April 13, 2011. That replacement check also remains uncashed.[9] (Compl. ¶¶ 26, 29.) Mast cashed the second check and purportedly "appropriated" and "converted" those monies to pay himself and his legal fees and expenses. (Compl. ¶ 27.)

---

[6] The release and settlement agreement identified "Willis Mast and Elsie Mast" as the "Releasors." Presumably, Elsie is Willis's wife; however, that is not clear from the record. She was not a party to the state court action.

[7] A handwritten notation on the release/settlement document states with respect to the $54,367.54: "This Release does not discharge or release any claim Releasors have against Aultcare or any other entity including but not limited to McKinley Life Ins. Co. to these funds."

[8] The other payees were Willis Mast, Kreiner & Peters Co. LPA, and Leiby Hanna Rasnick c/o Leiby, Hanna & Rasnick LLC. See Doc. No. 1 at 30, Ex. H.

[9] None of the proceeds have been paid to the Plan in accordance with its alleged first priority right to any payment received by Mast. (Compl. ¶ 28.)

Over a year after the settlement in Mast I, on July 15, 2011, Mast commenced a second lawsuit against McKinley and AC ("Mast II") that again sought a declaratory judgment on a theory that, while the terms of the Plan gave it subrogation and reimbursement rights and prohibited double recovery by the Plan participant, the Plan had no enforceable remedy. (Compl. ¶ 33 and Ex. D, Case No. 2011CV2192.) Defendants filed a motion for judgment on the pleadings, raising the issue of subject matter jurisdiction. (Compl. ¶ 34.) The state court granted the motion on February 23, 2012 and dismissed Mast II without prejudice for lack of subject matter jurisdiction, concluding that federal courts have exclusive jurisdiction over ERISA claims. (Compl. ¶ 34 and Ex. E.)[10]

This lawsuit followed on April 20, 2012. The complaint purports to set forth a claim under 29 U.S.C. § 1132(a)(3) for "Enforcement of the Terms of the Plan" along with "State Law Claims."

## II. DISCUSSION

Defendants' motion seeks to dismiss the entire case, under Fed. R. Civ. P. 12(b)(1) and (b)(6), "except for the equitable claim [against Mast only] under 29 U.S.C. [§] 1132(a)(3) to establish a constructive trust in that portion of the $54,367.54 check attached as Exhibit H to the Plaintiffs' Complaint that the Plaintiff can prove a right to a remedy in." (Doc. No. 6 at 47.)

**A.      Dismissal for Lack of Subject Matter Jurisdiction (Rule 12(b)(1))**

Where a defendant raises the issue of lack of subject matter jurisdiction under Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion

---

[10] Mast appealed that dismissal; however, the docket of the Fifth District Court of Appeals of Ohio shows that the appeal was voluntarily dismissed on May 23, 2012, about a month after this lawsuit was filed.

to dismiss. *Moir v. Greater Cleveland Reg'l Transit Auth.,* 895 F.2d 266, 269 (6th Cir. 1990); *see also, DLX, Inc. v. Kentucky,* 381 F.3d 511, 516 (6th Cir. 2004). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.,* 495 F.2d 906, 909 (10th Cir.1974). *See also, Kusens v. Pascal Co.,* 448 F.3d 349, 359 (6th Cir. 2006) ("federal courts are under an independent obligation to examine their own jurisdiction").

Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack on subject matter jurisdiction goes to whether the plaintiff has properly alleged a basis for subject matter jurisdiction, and the trial court takes the allegations of the complaint as true. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir.1990); *Smith v. Encore Credit Corp.,* 623 F.Supp.2d 910, 914 (N.D. Ohio 2008). A factual attack is a challenge to the factual existence of subject matter jurisdiction. No presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. *Ritchie*, 15 F.3d at 598; *Moir*, 895 F.2d at 269; *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1135 (6th Cir. 1996).

Defendants assert in their motion that they are making both a facial and a factual challenge to subject matter jurisdiction (Doc. No. 6 at 57); however, the memorandum in support of the motion does not clearly set forth both types of arguments. Rather, the Court concludes that defendants' challenge is entirely facial.

Citing several Sixth Circuit cases, notably *Community Health Plan of Ohio v. Mosser*, 347 F.3d 619 (6th Cir. 2003) and *QualChoice, Inc. v. Rowland*, 367 F.3d 638 (6th Cir. 2004) (which followed *Mosser* as binding precedent), defendants assert that this Court lacks

5

subject matter jurisdiction over the present action. However, with respect to subject matter jurisdiction, both *Mosser* and *QualChoice* are no longer good law.

In *Primax Recoveries, Inc. v. Gunter*, 433 F.3d 515 (6th Cir. 2006), the Sixth Circuit, in reliance upon "intervening Supreme Court precedent," *id.* at 517, "reject[ed] [its] characterization in *Mosser*, followed as binding precedent in this court in a number of cases, *see QualChoice, Inc.*, 367 F.3d at 642, 647, that a federal court has no subject-matter jurisdiction over an action ostensibly brought under 29 U.S.C. § 1132(a)(3) apparently for solely legal relief." 433 F.3d at 517. The court held that, "in such cases, a federal court has subject-matter jurisdiction, even if the plaintiff is unable to state a claim upon which relief can be granted." *Id.*;[11] *see also Longaberger Co. v. Kolt*, 586 F.3d 459, 466 n.4 (6th Cir. 2009) (noting that the Supreme Court in *Sereboff* "expressly abrogated our holding" in *QualChoice*). The court in *Gunter* clarified that, "[a]lthough in many ERISA cases prior precedent will almost certainly preclude the sought remedy, the decision whether to classify a particular claim as legal or equitable presents a sufficiently substantial and non-frivolous issue for federal courts to exercise subject-matter jurisdiction over actions arising under section 1132(a)(3)." 433 F.3d at 519.

Therefore, under *Gunter*, defendants are not entitled to a Rule 12(b)(1) dismissal with respect to any ERISA claim contained in the complaint. Rather, the question of whether the complaint seeks equitable or legal relief is a question to be raised under Rule 12(b)(6).[12]

---

[11] The "intervening Supreme Court precedent" was *Kontrick v. Ryan*, 540 U.S. 443 (2004) and *Eberhart v. United States*, 546 U.S. 12 (2005), which criticized "less than meticulous" uses of the term "jurisdictional[ ]": "'Clarity would be facilitated,' we have said, 'if courts and litigants used the label "jurisdictional" not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.'" *Eberhart*, 546 U.S. at15 (quoting *Kontrick*, 540 U.S. at 455).

[12] Defendants mention, almost in passing, that plaintiffs' claims for legal damages are "preempted" by ERISA. (Doc. No. 6 at 60.) Their argument, however, is not so much directed at preemption of state law claims as it is at showing that plaintiffs are seeking *legal* relief–a form of relief unavailable under ERISA. In other words, defendants construe the complaint as seeking relief only under ERISA, but a form of relief that is unavailable under that statute.

2. **Dismissal for Failure to State a Claim (Rule 12(b)(6))**

a) **Applicable Law**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[,]" Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 44, 47 (1957). Although this pleading standard does not require great detail, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing authorities). In other words, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.* at 556, n.3 (criticizing the *Twombly* dissent's assertion that the pleading standard of Rule 8 "does not require, or even invite, the pleading of facts"); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

ERISA permits a civil action to be brought "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]" 29 U.S.C. § 1132 (a)(3). "[O]ther appropriate equitable relief" is limited to relief that was "*typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993) (emphasis in original). "[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002) (footnote omitted). "[I]n addition to equitable restitution, § 1132(a)(3)(B) could also authorize a fiduciary's action to enforce an

'equitable lien by agreement.'" *Gilchrist v. Unum Life Ins. Co. of Am.*, 255 F. App'x 38, 44 (6th Cir. 2007) (examining *Sereboff v. Mid Atl. Med. Servs.*, 547 U.S. 356 (2006) (considering "the circumstances in which a fiduciary under [ERISA] may sue a beneficiary for reimbursement of medical expenses paid by the ERISA plan, when the beneficiary has recovered for its injuries from a third party")).

  **b)**   **The Complaint**

The complaint in this case is not a model of clarity. Paragraphs 8 through 44 (Section III and IV) set forth various factual allegations. The actual claims of the lawsuit are set forth in paragraphs 45-47 as follows:

V. ENFORCEMENT OF THE TERMS OF THE PLAN

  45. Pursuant to 29 U.S.C.§ 1132(a)(3), AIC and AC seek equitable relief, including, but not limited to, (1) restitution and the imposition of a constructive trust on defendants and an equitable lien on the fund represented by the Ohio Farmers check no. 217889, or any replacement thereof; (2) that defendants be required to hold the check, and any replacement if it becomes stale again, in trust for the Plan and; (3) a declaration of the Plan's right to enforce the ERISA laws and the terms of the Plan; and (4) enforce AIC's and AC's right to obtain full reimbursement from the Mullet settlement, without any reduction for any costs, expenses or fees incurred or assessed or paid by the plaintiff in Mast 1 or Mast 2.

  46. By refusing to cooperate with the Plan, ignoring the plain terms of the Plan, becoming an adversary to the Plan, converting Plan assets, and by refusing since April 2010 to reimburse the Plan, defendants have acted egregiously and without just cause, and have violated the terms of the Plan. Mast and his counsel have (1) converted Plan assets, (2) violated the prohibition against Mast collecting double recovery, (3) breached Mast's obligation as trustee to give the Plan first priority to any recovery, and (4) breached Mast's obligation to reimburse the Plan for the medical bills paid by the Plan in the sum of $54,367.54.

VI. STATE LAW CLAIMS

  47. AIC, AC and the Plan had a contractual relationship with Mast that he and his counsel breached, in violation of the plain terms of the Plan, all to the Plan's damage as follows: (1) loss of interest on the Plan's recovery since the settlement was paid in April of 2010; (2) financial losses for legal fees, litigation expenses and costs incurred unnecessarily in the defense of Mast 1; and (3) financial losses for legal fees, litigation expenses and costs unnecessarily incurred

in the defense of Mast 2 and in defending Mast's appeal from the judgment of dismissal in Mast 2.

Notably, Sections V and VI neither incorporate by reference nor repeat anything alleged in Sections III and IV.

### c) Section V -- The Enforcement Claim

Defendants do not challenge the complaint to the extent it seeks an equitable remedy against Mast alone by imposing a constructive trust and an equitable lien upon the funds represented by the $54,367.54 check. They seem to concede, at least for purposes of the motion to dismiss, that such cause of action properly states a claim for relief.[13]

Instead, defendants challenge the attempt by the Plan to seek any sort of recovery from the other settlement proceeds, represented by the check for $122,649.04, which funds have already been distributed. Defendants assert that the disbursed proceeds of the check for $122,649.04 do not constitute a "separately identified fund" from which plaintiffs can recover under the Plan's reimbursement provision and that plaintiffs are attempting "to impose personal liability on [defendants] for a contractual obligation to pay money−relief that was not typically available in equity." (Doc. No. 6 at 58, quoting *Knudson*, 534 U.S. at 210.) They argue that "[a] claim for money due and owing under a contract is quintessentially an action at law." (*Id*.) They also assert that any attempt by plaintiffs to recover their attorney's fees and/or interest constitutes an action at law, not equity, and is impermissible under ERISA.[14]

---

[13] Defendants do contest whether plaintiffs are "entitled to a remedy under the 'Make Whole' doctrine; [and] that the entire stated amount was, in fact, paid as a direct and proximate result of the golf cart incident; that the entire stated amount was, in fact, paid to each of the medical care providers; that the entire stated amount was, in fact, received by each of the medical care providers; and that the entire stated amount was, in fact, properly credited to Mast's accounts by each of the medical care providers in compliance with the terms of the contracts between [plaintiffs] and each of the medical care providers." (Doc. No. 6 at 54, n.2.)

[14] The claim for recovery of attorney's fees and litigation costs is not particularly clear. Section VI of the complaint asserts that plaintiffs seek to recover attorney's fees and costs related to Mast I and Mast II, which plaintiffs characterize as having been "incurred unnecessarily." (Compl. ¶ 47.) The Court construes Section VI of the

Plaintiffs, however, assert that the "separately identified fund" required by *Knudson* and *Sereboff* need not be a segregated sum of money separated and preserved from the tort recovery. They cite *Longaberger Co. v. Kolt*, 586 F.3d 459 (6th Cir. 2009), a case distinguished by defendants, where the administrator of an ERISA plan successfully sought to enforce the plan's reimbursement provisions against both a beneficiary and his attorney, by imposing a constructive trust or an equitable lien on already-disbursed settlement funds. *See also Barnes v. Alexander*, 232 U.S. 117, 121 (1914)[15] (reciting "one of the familiar rules of equity that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing").[16]

In *Longaberger*, Samuel Billiter, the dependent child of Theresa Billiter, a participant in the relevant ERISA plan, was injured in an automobile accident. The plan paid his

---

complaint as making a state law claim related to an alleged contractual relationship between the Plan and Mast "that he and his counsel [allegedly] breached, in violation of the plain terms of the Plan[.]" (Compl. ¶ 47.) If this claim were to proceed, an immediate question would be raised as to which "contract" is relevant. In Mast I and Mast II, Linda McAtee, a subrogation specialist for AultCare Corporation filed an affidavit attesting that "[t]he benefit certificate booklet . . . in effect on the date of the accident . . ." was attached to the affidavit. That attachment, dated 12/02, contains no mention, as far as the Court can find, of any right of the Plan to recover its attorney's fees and costs for actions such as Mast I and Mast II. In contrast, the complaint here contains Ex. F, dated 2005, alleged to be the relevant "Certificate of Coverage and Benefits of the Plan[.]" (Compl. ¶ 36 & Ex. F.) That exhibit purports to require a plan beneficiary to "pay any expenses, including attorney fees and court costs, that AultCare 'incurs' . . . to enforce its reimbursement right." (Doc. No. 1 at 26, Sec. C.) In their reply brief, defendants insist that the first time they ever saw Ex. F was when the complaint was served. Clearly, there is a factual dispute as to which of the two exhibits was in effect at the time of Mast's accident, and this ruling, which addresses the motion to dismiss, is not the place to resolve this factual dispute..

To complicate matters, the Prayer for Relief in the complaint seeks, *inter alia*, "[a]n order for specific performance of the terms of the Plan[,]" presumably including the disputed term requiring reimbursement of attorney's fees and costs. *But see*, *Knudson*, 524 U.S. at 211 ("Typically, . . . specific performance of a contract to pay money was not available in equity.") The Prayer also seeks attorney's fees and costs under 29 U.S.C. § 1132(g) for prosecution of the instant action, an entirely different matter. Section 1132(g) does permit this Court, in its discretion, to award "a reasonable attorney's fee and costs of action to either party" "[i]n any action under this subchapter[.]"

[15] In *Barnes*, an attorney promised other attorneys one-third of a contingent fee for their assistance in a particular case. Justice Holmes "concluded that Barnes' undertaking 'create[d] a lien' upon the portion of the monetary recovery due Barnes from the client, which [the assisting attorneys] could 'follow . . . into the hands of . . . Barnes,' 'as soon as [the fund] was identified[.]'" *Sereboff*, 547 U.S. at 363-64 (quoting *Barnes*, 232 U.S. at 123) (alterations in *Sereboff*).

[16] Neither *Longaberger* nor *Barnes* impose a strict tracing requirement.

medical bills in the sum of $113,668.31. Jeffrey Kolt, an attorney who represented the Billiters in civil tort actions against two negligent drivers, reached settlements in July 2004 with both insurance companies, receiving $35,000 from one and $100,000 from the other. Kolt deposited the entire $135,000 in his IOLTA and wrote a letter to the plan administrator indicating the Billiters' interest in trying "to amicabl[y] satisfy [the] subrogation obligation to [the plan]." About four months later, Kolt disbursed all but $1,000, keeping $45,000 for his attorney's fee, compensating two other attorneys a total of $2,750 for related legal work, and sending $86,082.18 to the Billiters.

The plan sued Kolt and the Billiters under its reimbursement and subrogation provisions, setting forth causes of action for constructive trust, equitable lien, and unjust enrichment; the plan later added additional causes of action for an accounting, equitable estoppel, and conversion, and, against Kolt only, for tortious interference with contract and breach of constructive trust.[17] Kolt filed a motion to dismiss under Rule 12(b)(6), arguing that, as an attorney for the beneficiary who received settlement funds from a third party, he had no duty to account to the plan and could not be held liable. The district court dismissed a number of the claims, but allowed the claims for constructive trust, equitable lien, and unjust enrichment to proceed. Shortly thereafter, the Supreme Court issued its opinion in *Sereboff*, prompting the plan to amend the complaint again, clarifying its position "seeking 'equitable lien by agreement'" in light of *Sereboff*. The district court ultimately held, on cross-motions for summary judgment, that:

---

[17] Along with the original complaint, the plan filed a motion for temporary restraining order and preliminary injunction. The district judge granted a "limited temporary restraining order" prohibiting further disbursement of funds and requiring preservation of "the identifiable settlement funds paid on claims arising out of the June 15, 2003 automobile accident involving Samuel Billiter." Following an evidentiary hearing on the motion for preliminary injunction, the district court also enjoined Kolt from dissipating the $1,000 still in his IOLTA.

11

> Longaberger automatically acquired a valid lien on the tort recovery fund when the funds became identifiable. In addition, Longaberger seeks equitable rather than legal restitution because the Plan specifies a particular amount and a particular fund from which restitution should be paid.

586 F.3d at 464-65. The district court ruled in the plan's favor against Kolt in the amount of $37,889.44 and against Samuel Billiter in the amount of $75,778.87, totaling the $113,668.31 that the plan had paid in medical expenses. Kolt appealed; Billiter did not.

On appeal, Kolt argued that, because the funds had been disbursed from his IOLTA account before the plan initiated its lawsuit, the plan was impermissibly pursuing a claim for money damages against him. Discussing *Sereboff*, the Sixth Circuit held that the language of the plan at issue identified a fund distinct from the beneficiary's general assets (namely, the proceeds of any recovery by the beneficiary from a third party) and further identified the particular share of that fund to which the plan is entitled (i.e., the extent of any benefits provided to the beneficiary by the plan). The court concluded that the plan's equitable lien "attached to the settlement fund when it was identified and received in July 2004." 586 F.3d at 467.

Kolt then argued that he could not be held liable under ERISA because he is neither a fiduciary nor a beneficiary under the plan. The court held that "there is no statutory barrier that prevents Kolt from being a defendant in a suit brought pursuant to § 502(a)(3) of ERISA, provided that the relief sought lies in equity." 586 F.3d at 468. In holding that the plan sought and was awarded "appropriate equitable relief" from Kolt, the court reasoned:

> Here, Longaberger asserted an action for equitable in rem relief under § 502(a)(3) in which it sought to recover its assets through use of a constructive trust and reimbursement lien. Longaberger properly identified a specific fund (i.e., that portion of the settlement funds equaling the amount Longaberger paid to cover Samuel Billiter's medical expenses) that was in the possession and legal control of Kolt, but belonged in good conscience to the Plan. The fact that Kolt chose to disregard Longaberger's first priority lien and commingle the settlement funds does not defeat Longaberger's claim for equitable relief, because under

12

> *Sereboff*, Longaberger was free to follow a portion of the settlement funds into Kolt's hands.

586 F.3d at 469.

Defendants argue that *Longaberger* is distinguishable from the instant case because in *Longaberger* the beneficiary's attorney had written a letter to the plan explicitly representing that the Billiters "would like to try to amicabl[y] satisfy [their] subrogation obligation to [the plan] . . . ." The Court is not persuaded by defendants' argument. With or without the letter from the beneficiary's attorney in that case, by virtue of the language of the plan itself, which "[had] a first priority claim against any proceeds paid by or on behalf of a liable third party and [was] entitled to reimbursement or subrogation regardless of whether [the beneficiary had] been made whole," *Longaberger*, 586 F.3d at 463, an equitable lien by agreement, similar to that upheld in *Sereboff*, had attached to the settlement funds as soon as they were obtained by the attorney and placed in his IOLTA account. It was that fact that permitted the plan in *Longaberger* to recover from the attorney who had disbursed the settlement funds without reimbursing the plan for the medical benefits it had paid. The court stated:

> The fact that Kolt chose to disregard [the plan's] first priority lien and commingle the settlement funds does not defeat [the plan's] claim for equitable relief, because under *Sereboff*, [the plan] was free to follow a portion of the settlement funds into Kolt's hands.

586 F.3d at 469.

Notwithstanding defendants' attempt to distinguish it, *Longaberger* provides that, if a plan identifies a fund distinct from the beneficiary's general assets, then the equitable lien of the plan attaches to it. Just such a situation exists here with respect to the *entire* amount of the settlement. Therefore, plaintiffs' claim for equitable restitution survives against all defendants

and, therefore, to the extent defendants' motion seeks dismissal of Section V of the complaint, the motion is denied.

### d) Section VI -- The State Law Claims

Although state law claims that "relate to" an ERISA plan are expressly preempted by the statute, *see* 29 U.S.C. § 1144(a) ("the provisions of this subchapter . . . shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title"), defendants' motion to dismiss does not specifically address the state law claims in the complaint.[18] Therefore, these claims are not before the Court and the Court will not rule on their viability at this time.

### III. CONCLUSION

For the reasons set forth herein, defendants' motion to dismiss is **DENIED**.

**IT IS SO ORDERED**.

Dated: March 25, 2013

                                                       **HONORABLE SARA LIOI**
                                                       **UNITED STATES DISTRICT JUDGE**

---

[18] Although not clear from the complaint nor clearly addressed by the parties in their briefing, to the extent paragraph 46 of the complaint can be construed as seeking relief in the form of damages by characterizing any failure to reimburse medical benefits as a breach of the ERISA plan (i.e., breach of contract) and/or conversion of ERISA funds, such claims would be completely preempted by ERISA. If defendants have in their possession funds that properly belong to the Plan, as alleged in paragraph 45, ERISA already provides a remedy for the equitable return of those funds; the Plan is not permitted to sue under alternative theories to recover those funds. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004) ("any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted."); *see also Loffredo v. Daimler AG*, No. 11-1824, 2012 WL 4351358, at *9 (6th Cir. Sept. 25, 2012) (Moore, J., concurrence constituting the opinion of the court) (discussing the principle of "complete preemption").